ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| HCS, Inc. | )    ASBCA No. 60533 |
| | ) |
| Under Contract No. N69450-15-M-5346 | ) |

APPEARANCE FOR THE APPELLANT:    Mr. Douglas Reitmeyer
   Vice President for Litigation

APPEARANCES FOR THE GOVERNMENT:    Ronald J. Borro, Esq.
   Navy Chief Trial Attorney
   Robert G. Palmer, Esq.
   Associate Counsel
   Naval Facilities Engineering Command
   Southeast
   Jacksonville, FL

OPINION BY ADMINISTRATIVE JUDGE HARTMAN

The Department of the Navy unilaterally modified a contract's scope of work to require a contractor to cap a leaking 4" pipeline that perpendicularly intersected an 8" pipeline in lieu of replacing "up to 60 feet" of the 8" pipeline deemed originally by the Navy to be the source of a water leak. After completion of all contract work, the Navy unilaterally reduced the price of the parties' contract by more than 50%. Appellant seeks in this accelerated Board Rule 12.3 appeal its original fixed-price for the contract, less an adjustment for materials bid that it was not required to use and new materials added to the contract as a result of the Navy's unilateral change.

FINDINGS OF FACT

In July of 2015, a Department of the Navy contracting officer (CO), LT Joel Overson, requested receipt of quotes from small businesses to "Provide all Labor, Materials, equipment, Tools, Transportation and Management necessary to repair [an] 8" pipe and isolation valve" at Naval Air Station (NAS) Corpus Christi, Texas (R4, tab 1; tr. 89-90). The request contained a "STATEMENT OF WORK" providing as follows:

1. Isolate, drain, excavate, provide adequate shoring to ensure prevention of collapse/undermining of surrounding area(s), **selectively demolish, and remove up to three** twenty foot (20'-0") long sections of eight inch (8" dia.) steel water line sections located along

Avenue "C" that may have failed and are leaking **and, as necessary, fittings**...that along with the pipe are **buried at a maximum depth of up to approximately ten feet (10'-0") as well as the four inch diameter (4" dia.) Isolation Valve located approximately adjacent to Building 20**....

....

3. Expose the existing potentially leaking sections of eight inch diameter (8" dia.) steel water piping section(s) by excavating the existing and adjoining/surrounding areas of the existing asphalt and/or concrete-base parking lot area(s) **as necessary** utilizing various safe methods of excavation (including saw cutting where appropriate) **to completely expose leaking piping section(s)** and utilize a trench box to provide the necessary shoring and limit the ultimate amount of excavation required.

....

5. **Having determined what excavated and existing section(s) and fitting(s) of the eight inch diameter (8" dia.) have in-fact failed** and are leaking, **selectively demolish and remove the affected section(s)** of eight inch diameter (8" dia.) of water line and fittings (if required) with the piping sections **to facilitate the necessary and direct installation of the replacement section length(s)** of eight-inch diameter (8" dia.)...poly or High Pressure Certified HDPE Piping, as well as the appropriate and matching material eight-inch diameter (8" dia.) Pipe Fittings....

6. Having excavated and exposed the existing failed/leaking isolation valve (Valve 119). selectively demolish and remove the existing isolation valve (Valve 119), and then install a replacement isolation valve that exactly matches the existing isolation valve....

....

9. After having completed the installation and connection of the new section of Poly or High Density Polyethylene (HDPE) eight inch diameter (8" dia.)...Water Piping Sections(s), and the new four inch diameter (4" dia.) isolation valve...perform the appropriate flow and leak testing for both the newly installed piping and the newly installed isolation valve, remove the trench box utilized for shoring, backfill (as required) the excavated trenched section opening(s), and replace the excavated asphalt parking area to match the existing asphalt parking area(s) to complete restoration of the job site area(s) to a normal condition. [Emphasis added]

(R4, tab 1 at 4-5) The quotation request stated that the period of performance is 20 calendar days and that there would be a site visit for potential offerors "to satisfy themselves as to the general and local conditions that may affect the cost of the performance of the work to the extent that such information is reasonably attainable" (*id*. at 3, 5). The request incorporated by reference various standard contract clauses, including Federal Acquisition Regulation (FAR) 52.233-1, DISPUTES-ALT. 1 (MAY 2014); FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); and FAR 52.243-5, CHANGES AND CHANGED CONDITIONS (APR 1984) (R4, tab 1 at 21-22). Attached to the request was a "PROJECT LOCATION MAP," which contained an arrow pointing to a specific area at the NAS Corpus Christi along "C" Street, and stated: "ISOLATE 8" ISO-VALVE 121A AND EFFECT REPAIRS TO REPLACEMENT OF FIVE FOOT (5'-0") LONG SECTION OF EXISTING 8" DIA. WATER LINE" (R4, tab 1 at 51).

On 17 August 2015, the CO amended the statement of work in the request for quotations to advise potential offerors that:

4. Groundwater is an ongoing issue that any trenching or digging related project can encounter. As such the contractor should take prudent steps to deal with any groundwater encountered in a manner consistent with both regulatory/statutory requirements and safety practices.

(R4, tab 2 at 8)

Appellant, HCS, Inc. (HCS), is a small business located in Waco, Texas, about five hours away from NAS Corpus Christi. Both the president of HCS, Carl Ballerino, and Ben Moberg, president of HCS's prospective pipe-repair subcontractor, Quality Contracting, attended the site visit at NAS Corpus Christi. Based on his experience

3

that most pipe leaks occur at pipeline joints and the small size of the sink-hole that existed at the site of the NAS leak, Mr. Moberg, believed the NAS leak likely occurred at a pipeline joint, and could be replaced by cutting and removing a small section of the pipe and installing a short section of new pipe (along with appropriate couplings). He prepared a bid for Mr. Ballerino/HCS based on this belief, Mr. Ballerino/HCS relied upon that bid in preparing HCS' prime contractor bid, and HCS submitted to the CO a bid in the sum of $40,975.00, which was within 2 percent of the government's estimated cost for performance of the work specified. (Tr. 166, 273-76; exs. G-1, A-1)

On 3 September 2015, the Department of the Navy CO awarded Contract No. N69450-15-M-5346 to HCS for the pipeline repair work at NAS Corpus Christi and HCS entered into a subcontract with Quality Contracting with respect to the performance of that work. Thereafter, HCS (and Quality) obtained the necessary approval of plans, permits, and training certification necessary to proceed with the work. (R4, tab 4; tr. 7, 33-38, 229, 237-38, 248-49)

On Tuesday, 8 December 2015, Mr. Moberg traveled about five hours from Waco, Texas, to Corpus Christi, Texas, with two 10-foot sections of 8" pipe and two mechanical couplings. After arriving at the site, he located the utilities and measured the depth of the pipe to be repaired. (R4, tab 13 at 1, 29; tr. 236, 251-52) The next day, on 9 December 2015, Mr. Moberg used a backhoe to excavate a trench about 10' deep and 10' long in the vicinity of the sink hole exposing the 8" pipe deemed leaking, installed a trench safety box, performed checks to ensure the trench was safe for men to work, discovered that a 4" pipe perpendicularly intersected the 8" pipe in a "tee" joint near the sinkhole, requested NAS "turn on" the water to the 8" pipeline (which had been "turned off" since discovery of the sinkhole months earlier), and water began coming into the newly dug trench from the side of the trench where the 4" pipe ran. Because the leak appeared to be coming from the 4" pipe Mr. Moberg excavated the 4" line for a distance of about 10' and exposed a leak in that line. (R4, tab 13 at 3; ex. A-17 at 3; tr. 14, 20, 64, 254-59)

Mr. Moberg then had the water to the 8" line shut off and notified the CO's representative (COR), an ensign who had graduated from the Naval Academy only a few months earlier, that the water leak was in a 4" pipe intersecting the 8" pipeline specified to be repaired and sought direction from the Navy. The ensign promptly came to the work site. Mr. Moberg asked where the 4" pipe intersecting the 8" pipe went and was told that it was a "dead-end line." The 4" pipe previously had supplied water to a nearby building that had been demolished and had been capped at time of demolition years ago. Mr. Moberg advised the ensign that there were two options. He could remove the "tee joint" where the 4" line joined the 8" line and replace it with a piece of 8" pipe and two couplings, which he had with him on site to repair the 8" pipe, since the 4" pipe was not in use. Alternatively, he could place a cap on the 4" pipe between its intersection with the 8" pipe and the leak in the 4" pipe, but he

4

would have to procure a cap for the 4" pipe. The ensign advised Mr. Moberg during his 5 to 10 minute visit to the site that he could not make the call as to which option to pursue and would have to get back to him, that he should stop work on the leak, and that he should proceed with the other specified work, i.e., replacement of the 4" valve. (Tr. 8-9, 15-16, 40-42, 56-57, 64-65, 67, 258, 260-63, 267, 274-77)

On Thursday, 10 December 2015, the following day, Mr. Moberg pumped water out of the trench he dug the day before and spent two hours using a saw to cut concrete paving overtop the 4" valve to be replaced. Quality Contracting then left the site to travel five hours home to Waco, Texas. (R4, tab 13 at 8; ex. A-17 at 8; tr. 42, 62)

In drafting the scope of work for the contract, the Navy's engineer with the Utilities and Management Branch of the Public Works Department at NAS Corpus Christi knew that there was a 4" pipeline intersecting the 8" pipeline near the sinkhole that ran for about 20 to 30' that had been "capped-off years earlier." The engineer, however, "surmised that the leak was coming from the 8" line" because the 4" line "had been capped and abandoned at the end of the run." If the engineer had been informed after excavation that the leak was in the 4" pipeline, rather than the 8" pipeline, he may have recommended that the Navy have Quality remove the "tee" joint and replace it with a piece of pipe, but he was not consulted by either the Navy COR or field engineering representative. (Tr. 159-63, 173-76, 180, 183-84, 186-87)

On or about Monday, 14 December 2015, the Navy's COR and engineering technical representative decided together that the "best way forward" was to cap the 4" pipe line between its intersection with the 8" line and the leak. The contractor thus was instructed by the government to continue its work to resolve the leak by "capping" the 4" pipe line. Mr. Moberg of Quality, therefore, purchased a cap for the 4" line from a supplier located near his home base in Waco before returning to Corpus Christi. (Tr. 14-16, 23, 42-44, 185-86, 267-68) In a Request for Proposal (RFP), the COR asked that HCS "[e]stimate credit back to government for 8 inch waterline work not to be completed" by 18 December 2015 (R4, tab 11 at 24 (14 December COR email)).

On Tuesday, 15 December 2015, five days after departing Corpus Christi, Quality again traveled five hours to Corpus Christi with a 4" cap. It then worked for five and a half hours at the NAS site. It excavated the hole for the valve replacement and installed the trench box for that replacement. (R4, tab 13 at 11; ex. A-17 at 11; tr. 42, 268)

On Wednesday, 16 December 2015, Quality worked for 10 hours. It replaced the valve specified for replacement, pumped ground water from the trench it had dug previously in the vicinity of the leak, cut and removed a piece of the 4" pipeline about 8' from the 8" pipeline prior to the leak on the 4" pipeline, and then placed a cap upon the 4" pipeline running to the joint at the 8" pipeline. The following day, on Thursday,

17 December 2015, Quality worked 11 hours. It "Pressured up the Waterline" and new valve to operating pressure. The Navy COR inspected the work and, when there was no leak, Quality then backfilled both holes and poured concrete paving in the area of the valve. (R4, tab 13 at 15, 19; ex. A-17 at 15, 19, 21; tr. 274-77) The same day, Quality prepared an estimate for the change in work showing a net change to contract price of -$1,435.00 as follows:

Credit for change in proposed work.

|  | | |
|---|---|---|
| | Labor: | $600.00 |
| | Fittings | $660.00 |
| | 8" pipe | $360.00 |
| Total credit for change | | $1,620.00 |

Additional for change in proposed work:

|  | | |
|---|---|---|
| | Labor: | $100.00 |
| | Cap | $85.00 |
| Total credit for change | | $185.00 |

**Net Change to Contract**      **$-1435.00**

(R4, tab 11 at 23 (Moberg email))

On Friday, 18 December 2015, Quality worked ten and a half hours. It landscaped the area that it had disturbed, cleaned up the job site, and demobilized. The COR, who had authority to direct performance of work necessary to accomplish the project, directed Quality to perform a water clarity test to ensure that the water in the pipeline was drinkable. The water clarity test was not work specified in the contract. Quality attempted to perform the test but employees of the NAS plumbing department all had gone home early for the weekend so no one was available to turn on the water necessary to perform that test. (R4, tabs 4, 13 at 23; ex. A-17 at 23; tr. 52-55, 272-73)

On Monday, 21 December 2015, Mr. Moberg traveled about five hours back to Corpus Christi, got the NAS plumbing department to turn on the water for the pipeline, flushed the water out of the fire hydrant on the corner of Second Street and Avenue C, pulled a water sample from the same hydrant, delivered that sample to the county office for testing, and traveled about five hours back to Waco, Texas, for a total of 18 work hours (R4, tab 13 at 27; ex. A-17 at 27; tr. 52-55).

Mr. Moberg returned to his supplier in Waco the 2 pieces of 8" pipe and 2 couplings he had purchased for a credit, which was subject to a re-stocking fee (tr. 268-69, 271). On Tuesday, 22 December 2015, Quality stated that its costs due to the change in work requiring the water quality test were $1,500.00. Quality also

offered a credit of $34.00 per foot for 60 feet of 8" pipe to resolve the issue of a NAS credit but maintained no such credit was due because the "original contract states **UP TO 60' OF PIPE**" and thus "was **not** a per foot bid." (R4, tab 7) (Emphasis in original) By email of the same date, CO Overson advised HCS that the COR had issued to HCS the RFP for the credit, the COR was more intimately involved with details of the project, the COR was on vacation that week, and conversation regarding the credit due would need to occur the next week. Six days later, on 28 December 2015, the COR advised the CO that the following changes should be made in the statement of work for the contract:

> [E]liminate the following:
>
> 1. Excavate, expose, remove and replace up to 60 linear feet of eight inch diameter (8" dia.) steel water line sections with up to 60 linear feet of eight inch diameter (8" dia.)...direct matching equivalent of poly or High Pressure Certified HDPE Piping, as well as the appropriate and matching material eight-inch diameter (8" dia.) pipe fittings....
> 2. All labor, equipment, materials, transportation, and supervision necessary to complete the above....
>
> [A]dd the following:
>
> 1. Cut and cap four inch diameter (4" dia.) waterline branch attached to eight inch diameter (8" dia.) waterline main to eliminate existing leak on the 4" dia. waterline. Cap the four inch diameter (4" dia.) waterline with matching materials.
> 2. Take a water sample and have the sample tested by Nueces County Water Lab.

(R4, tab 12 at 11) The same day, the CO notified HCS by email he was "not entertaining hypotheticals about the 8" pipe." He stated that:

> Per the changes clause in the contract, that portion of work will be removed from the scope, since it was discovered to not be the source of the leak. Since that work will be removed from the contract it is therefore not a relevant discussion point, aside from the equitable adjustment that we now need to settle.

7

We await your response to the RFP received from [the COR]. Your response should include:

-the equitable adjustment due the Government for the removal of work associated with the 8" pipe (excavation, replacement, etc.)

-the equitable adjustment due HCS for exposing and capping the 4" line

-the equitable adjustment due HCS for taking the water sample

While I am not going to get into specific pricing at this time, we both know that it is not realistic that this would be a no-cost change, as Doug [Reitmeyer] is hoping for. You would not have bid the same amount for the work that was actually required.....

...The contractor is requested to provide a cost break-down detailing materials, equipment, and labor to demonstrate the accuracy of the incurred costs. The contractor is requested to provide bills of lading, supplier quotes, receipts, or other material evidence.

Mr. Reitmeyer replied by email on behalf of HCS the same day that:

This was a firm, fixed price contract which has been completed and accepted by the government. As such, the government is not entitled to "bills of lading, supplier quotes, receipts, or other material evidence" or any other costs related to the original scope of the contract that was completed, only for any "extra" work that wasn't contemplated by the original contract.

(R4, tab 6 at 3-5) Two days later, on 30 December 2015, CO Overson notified HCS as follows:

Your response to the RFP...has not been received....

Your response is due to me NLT 05 January 2016. If no response is received, I will have no recourse but to execute the deductive contract modification based upon the Government's estimate of costs.

8

I had hoped to negotiate a fair and reasonable settlement, but it seems that Doug is steering HCS towards another direction.

If you choose to provide a response, I am requesting that you provide a cost break-down detailing materials, equipment, and labor to demonstrate the accuracy of the incurred costs, including bills of lading, supplier quotes, receipts, or other material evidence. You certainly have the right to not provide those supporting documents. However, if we cannot reach an agreement now, and I am forced to execute the modification unilaterally, you will have to provide those documents later in support of any request for equitable adjustment that you may seek, per the disputes clause. So feel free to hang on to that right, but it will only draw out longer the resolution that we both seek.

(R4, tab 6 at 2)

Sometime in January 2016, the COR, who possessed a degree in mechanical engineering from the Naval Academy awarded seven months earlier, but who had no actual experience in performing construction work, other than his approximately seven months as a COR at NAS Corpus Christi, used "RS Means" to prepare an estimate of the cost of performing his proposed modified scope of contract work. While both the bid submitted by HCS and the Navy's original estimate for performing contract work by its engineer in the Utilities and Management Branch, Public Works Department, NAS Corpus Christi, were within 2% of each other, the COR's estimate of cost for performing the revised contract work was about 50% less than both the original Navy estimate and HCS's bid, i.e., $19,892.87. (R4, tab 5 at 2; ex. A-16 at 4; tr. 6, 15, 58-61, 92)

On 27 January 2016, CO Overson issued a modification to the contract making revisions in the contract scope of work exactly as stated in the COR's proposal of 28 December 2015 quoted above (both deletions and additions). The CO stated in the 27 January modification that, "[a]s a result of this [contract] modification, the total funded amount [is] decreased by $21,082.13 from $40,975.00 to $19,892.87." (R4, tab 5 at 3)

On 24 February 2016, HCS submitted to the CO a claim "to be paid the original contract sum," i.e., $22,564.00 additional. HCS explained that the "original contract was $40,975.00" and, "minus a customer credit of $236.00" and $18,175.00 it had been paid, the sum due it for performance of the contract was $22,564.00. HCS indicated Quality had provided a material credit of $968.00 ($732.00 for 2 fittings and

9

$236.00 for 20' of 8" pipe) and a credit of $600.00 for labor and equipment. (*See* R4, tab 7 at 3, 7)

On 5 April 2016, CO Sandra White, Chief of Contracting, Naval Facilities Engineering Command Southeast, Jacksonville, Florida, who received the claim on 7 March 2016 (R4, tab 8), issued a decision which found there was "a partial entitlement" to the claim relating to "unilateral deductive contract modification descoping contract work" and "remanded the claim" to CO Overson at Corpus Christi "to facilitate negotiations" regarding an "appropriate price adjustment associated with the contract." The decision stated that it was "the Final Decision of the Contracting Officer" and could "be appealed to the [ASBCA]." (R4, tab 9; tr. 124, 127)

One week later, on 12 April 2016, HCS filed its appeal with this Board. The next day, on 13 April 2016, CO Overson sent Mr. Ballerino of HCS an email stating:

> I am prepared to offer $5,164.00 to cover the portion of the claim that we have determined to have merit. That amount probably will not satisfy you though, as I understand that you feel you are due the full $22k.
>
> I have also heard that it can cost more than $100K to go through the ASBCA appeal process. If that is true, the economics of it don't make much sense to me, but of course you have the right to do so.

(App. supp. R4, at 8; R4, tab 10)

On 18 July 2016, we held a one-day trial in Waco, Texas, in this accelerated appeal pursuant to ASBCA Rule 12.3. During trial, the COR testified that HCS did everything it was required to do by the contract's statement of work, except replace part of the 8" pipeline. The COR further testified that, if the contractor had replaced one foot of the 8" pipeline and resolved the leak, it would have complied with all requirements of the scope of work. (Tr. 50-52, 66-67) The COR admitted that if Quality had been allowed to (a) remove the "tee joint" from the 8" pipeline to the 4" pipeline and (b) replace the joint with a piece of about 18"-long 8" pipe and couplings it had brought to the site, Quality would have resolved the leak problem and complied with all contract requirements (tr. 66-67, 73-74). The COR added, however, that he stopped Quality from performing work on the 8" pipe after discovery of the leak location and later directed Quality perform work outside the scope of contract work (i.e., cap the 4" pipeline in lieu of replacing the "tee joint" in the 8" pipe) that Quality performed (tr. 66-67, 70, 81). The COR testified he also directed performance of a water test outside the scope of contract work that the contractor performed and that the contractor was entitled to reimbursement for its costs related to that work (tr. 52-53).

10

Mr. Moberg testified during trial that he anticipated two trips to Corpus Christi when bidding the job. He added, however, that he had to make a third trip to Corpus Christi due to the unavailability of NAS plumbing personnel on a Friday to turn on water to the 8" pipeline to perform the water quality test newly added by the COR. (Tr. 270-72)

## DECISION

In this appeal, the Navy argues it is entitled to reduce the contract price of $40,975.00 by $21,082.13, i.e., by more than 50%, to $19,892.87 due to a unilateral change directed by the COR during contact performance — capping of the 4" pipeline perpendicularly intersecting the 8" pipeline originally deemed leaking by NAS Corpus Christi prior to the location of the actual leak in the 4" pipeline in lieu of replacing part of the 8" pipeline thought to be leaking. According to the Navy, it is owed the credit in price because the parties' contract "required the Appellant to completely excavate the entire sixty feet of eight inch pipe," then to "demolish and replace" that pipe, and upon completion of the pipe replacement to restore the area excavated to "its 'normal condition,'" but all of that work unilaterally was deleted from the contract by the CO (gov't br. at 1, 4) (emphasis deleted). The Navy adds that, since HCS "has provided no receipts, costs, accounting records or other documentation to justify its demand for the full contract price," the contract price owed "can only be established" by the Navy's "estimate" and "deductive change calculations provided in the Rule 4 file" (gov't br. at 3).

HCS argues that its contract was a firm-fixed-price contract and the Navy has converted the contract into one for cost reimbursement after completion of all contract work. According to HCS, the only aspect of the originally specified work it did not complete was replacement of part of the 8" pipeline, which the COR directed not be performed when directing the contractor to install a cap upon the 4" pipeline. HCS states that, while the Navy is entitled to "bills of lading, supplier quotes, receipts, or other material evidence" of costs related to the "extra" work that wasn't contemplated by the original contract and added by the COR, i.e., capping of the 4" line, it is not entitled to demand proof of cost of "all work performed" and then "reprice" the entire contract after completion of both the original and added contract work based on actual costs incurred or an estimate of such costs by its COR or other personnel. (R4, tab 6 at 3; tr. 72-79, 126-27, 147-49)

The Navy is correct that, under the Changes clause, the contract price must be equitably adjusted when a change in the contract work causes an increase or decrease in the cost of performance of the work. *CTA, Inc.*, ASBCA No. 47062, 00-2 BCA ¶ 30,947 at 152,761-62; *Mills Trucking, Inc.*, ASBCA Nos. 50163, 50164, 97-1 BCA ¶ 28,907 at 144,115; FAR 52.243-5. Because the purpose underlying an equitable

11

adjustment is to safeguard both contractors and the government against the increased costs engendered by modifications adding or deleting contract work, respectively, an equitable adjustment must be closely related to and contingent on the altered position in which the contractor finds itself by reason of the modification. *Nager Elec. Co. v. United States*, 442 F.2d 936, 946 (Ct. Cl. 1971); *Bruce Constr. Corp. v. United States*, 324 F.2d 516, 518 (Ct. Cl. 1963). Where a credit is claimed for decreased work, as here, the credit is measured by the contractor's net cost savings. *CTA*, 00-2 BCA ¶ 30,947 at 152,762; *Fordel Films West*, ASBCA No. 23071, 79-2 BCA ¶ 13,913 at 68,298. In sum, with respect to a change that deletes contract work, the government is entitled to a downward adjustment in contract price to the extent of the savings flowing to the contractor therefrom. *CTA*, 00-2 BCA ¶ 30,947 at 152,762; *Celesco Indus., Inc.*, ASBCA No. 22251, 79-1 BCA ¶ 13,604 at 66,683.

The government has the burden of proving the amount of cost savings due to deletion of work. *Nager Elec.*, 442 F.2d at 946; *Celesco Indus.*, 79-1 BCA ¶ 13,604 at 66,684. A contractor, therefore, is entitled to receive its contract price, unless the government demonstrates the government is entitled to a price reduction for deleted work. *CTA*, 00-2 BCA ¶ 30,947 at 152,762; *Mills Trucking*, 97-1 BCA ¶ 28,907 at 144,115.

We initially examine the language of the parties' contract to ascertain what was required of HCS. While the Navy contends that HCS was required "to completely excavate the entire sixty feet of eight inch pipe," then "demolish and replace" the 60 feet of pipe, and on completion of replacement restore the 60-foot area excavated to "its 'normal condition,'" the contract awarded HCS provided it was to excavate and remove "**up to** three twenty foot...long sections of eight inch...[diameter] steel water line sections" and HCS was to "[e]xpose the existing potentially leaking sections of eight inch diameter...steel water piping...**as necessary**" (R4, tab 1 at 4) (emphasis added). Further, the parties' contract provided that, "[h]aving determined what excavated and existing section(s) and fitting(s) of the eight inch diameter...[pipe] have in-fact failed and are leaking," HCS was to "**selectively** demolish and remove the affected section(s) of eight inch diameter...water line and fittings (if required)...to facilitate the necessary and direct installation of the replacement section length(s)" (R4, tab 1 at 4) (emphasis added). Accordingly, there was no express contractual requirement that HCS excavate, demolish, and replace 60 feet of pipe. Instead, it was only required to do so "selectively" and "as necessary."

As found above, HCS excavated approximately 10 feet of the 8" pipeline and ascertained that the leak was not coming from the 8" pipeline, but from a 4" pipeline that joined at a "tee joint" the 10' of 8" pipeline excavated. HCS then excavated about 10 feet of the 4" pipeline and located the leak approximately 8' along the 4" pipeline. HCS therefore excavated and exposed about 20' of pipeline (or up to 60 feet of pipe) as necessary and determined which sections of excavated and existing pipe had failed.

While HCS was prepared to demolish (and replace with a new piece of pipe and two couplings) the part of the 8" pipe that would have stopped the leak, i.e., the tee joint to the 4" pipe that went nowhere, HCS was told to pursue an alternative course of action by the Navy's COR. In order to stop the leak, the COR directed HCS to demolish and remove part of the 4" pipe and to "cap" the 4" pipe where HCS had demolished and removed part of that pipe, which had been abandoned years earlier when it was capped further along that pipeline when the building it supplied water to was demolished. HCS performed the new work directed by the COR, i.e., the demolition of 4" pipe and the installation of a cap, along with the remaining work specified by its original contract, i.e., the excavation and replacement of a 4" isolation valve at another location, the backfilling of all areas excavated, and the restoration of areas excavated to their normal condition. Thus, HCS performed all of the work required by its original contract, except for the replacement of part of the 8" pipe to stop the leak. While it could have used the couplings and less than 3 feet of the pipe it had brought with it to replace the tee joint to the 4" pipe, thereby stopping the leak of water flowing through the 8" pipe to the 4" pipe, the COR directed that HCS install a new piece of pipe, a "cap," on the 4" line of pipe. Accordingly, the only potential savings flowing to HCS from the Navy's "change" in contract work was with respect to the labor and material it needed to "selectively" install a replacement piece of 8" pipe.

While the installation of the 4" cap was an addition to the scope of contract work, HCS did not submit a claim to the COR for an equitable adjustment based on that change. Rather, it simply proposed offsetting its proposed credit to the Navy for not replacing any part of the 8" pipe with its costs associated with its replacement of part of the 4" pipe with a cap. The Navy, however, rejected the contractor's proposal, electing to have its inexperienced COR estimate the price of "all" of the contract work, i.e., the cost of capping a 4" pipe and replacing the 4" valve at another location. Using R.S. Means, the COR arrived at an estimate for this work that was more than 50% less than the contract award price and more than 50% less than the government's original estimate for performance of contract work. The CO then adopted the COR's "estimate" as the contract price, asserting it was proper because the CO was unilaterally deleting all work associated with the 8" pipeline from the contract's scope of work more than a month after all of that work, except replacement of part of the 8" pipe, actually was performed by HCS.

As discussed above, the burden of proof is on the Navy to show the amount of cost savings due to its deletion of work. In this appeal, the Navy relies on the cost estimate prepared by the COR and another estimate (prepared during litigation by a Florida engineer employed by the Navy) based upon Means. During trial, the Navy presented no testimony regarding actual preparation of the estimates or specific cost savings due to deletion of contract work, asserting in sum that the engineers' written calculations spoke for themselves. It maintained simply that its CO deleted all work relating to the 8" pipeline after the contractor had completed that work (other than the

13

replacement of part of the 8" pipe), necessitating the repricing of the entire fixed-price contract on a cost incurred basis (including replacement of the 4" valve at another location), and the Navy was free to estimate such costs using Means because HCS failed to come forward with evidence of all costs it had incurred.

We are aware of no authority allowing the Navy to delete work from a contract after work performance and then refuse to pay for the work initially specified and performed, and the Navy cites us no legal authority for such action. The sole basis offered by the Navy for re-pricing the entire contract here is its alleged existence of a Type I "differing site condition," i.e., a leak in a 4" rather than 8" pipe located at the geographic location specified by the Navy, a site which it knew prior to contract award contained both 4" and 8" water pipeline. No claim of a differing site condition, however, has been asserted by HCS in writing, as expressly required by the differing site condition clause, FAR 52.236-2. We, therefore, need not decide whether a 4" difference in size of water pipe leaking constitutes a "material" difference in site condition under the facts of this appeal, as the Navy now asserts.

At trial, Mr. Moberg testified under oath that he returned to his supplier in Waco 2 pieces of 8" pipe that was 10' in length and 2 couplings he had purchased previously for a credit, which was subject to a re-stocking fee. He estimated prior to returning these materials that he would obtain a credit of $1,020.00 but actually was given a credit of about $968.00 ($732 for fittings and $236 for 20' of 8" pipe) (*see* R4, tab 7 at 3; tr. 268-69, 271). He estimated during contract performance the change would save $600.00 in labor and provided a credit of $600.00 for labor and equipment. The total credit Quality provided for deletion of 8" pipe work therefore was $1,568.00 (R4, tab 7). With respect to the additional new 4" pipe work, Quality asserts that it is owed $150.00 for the pipe cap and $200.00 for labor. Quality also asserts it is owed $1,500.00 for performing the water quality test that the COR and CO conceded was additional work not originally specified and directed by the COR. The net change in contract priced based on these numbers is that HCS is entitled to $282.00 more than its original contract price for performing the work at NAS Corpus Christi.

At trial, the Navy did not specifically challenge the reasonableness of any of the dollar amounts presented by Quality or HCS. Simply put, the Navy did not carry its burden of proof. It has made no showing here of entitlement to a price reduction based on deleted work. *CTA,* 00-2 BCA ¶ 30,947 at 152,761-62; *Mills Trucking,* 97-1 BCA ¶ 28,907 at 144,115.

A contractor is entitled to receive its contract price where the government fails to demonstrate entitlement to a contract price reduction for deleted work. Based upon the record here (including unchallenged costs for conceded extra work), we conclude HCS is entitled to a contract price of $41,257.00 ($40,975.00 + $282.00).

14

## CONCLUSION

The appeal is sustained. HCS is entitled to recover $23,082.00 ($41,257.00 less the sum it already has been paid of $18,175.00), plus interest under the Contract Disputes Act in accordance with 41 U.S.C. § 7109 from 7 March 2016, the date of receipt of the claim, until paid.

Dated: 20 September 2016

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60533, Appeal of HCS, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

15